[Docket No. 1]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

ANGEL L. FLORES,

     Plaintiff,

         v.

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

Civil No. 15-6356 (RMB)

**MEMORANDUM ORDER**

**BUMB**, UNITED STATES DISTRICT JUDGE:

     This matter comes before the Court upon the appeal by Plaintiff Angel L. Flores (the "Plaintiff") of the final determination of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for social security benefits [Docket No. 1].  For the reasons set forth below, the Court **VACATES** the decision of the Administrative Law Judge (the "ALJ") and **REMANDS** for further proceedings consistent with this Memorandum Order.

     The Court finds as follows:

     1.   Plaintiff applied for social security disability benefits on July 12, 2012, and for supplemental security income benefits on July 16, 2012, originally alleging an onset date of January 1, 2006.  The claims were denied initially on January 18, 2013 and upon reconsideration on May 7, 2013.

[Administrative Record ("R.") 44-78, 79-110].  His alleged onset date was subsequently amended to July 1, 2011.  [R. 21].

2.    Plaintiff alleges that he suffers from disabling back pain, as well as mental health issues resulting in, for example, in difficulty concentration, forgetfulness, and an alleged inability to care for himself properly.  See, e.g., [R. 276-83].  He suffers from depression and anxiety, and has been diagnosed with schizoaffective disorder.  See, e.g., [R. 391-96].

3.    The ALJ found that Plaintiff suffers from the following severe impairments: lumbar degenerative disc disease, depression, and anxiety.  [R. 23].  The ALJ found that Plaintiff did not suffer from a listing level impairment.  [R. 23-26].  The ALJ next determined that Plaintiff had the residual functional capacity ("RFC") to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b), except that he is limited to unskilled work.  He is capable of understanding, remembering, and carrying out simple instructions, making judgments that are commensurate with the functions of unskilled work (i.e., simple work-related decisions), responding appropriately to supervision, co-workers, the general public and usual work situations, and dealing with changes in a routine work setting."  [R. 26].  The ALJ then determined that Plaintiff could not return to his past relevant work.  [R. 33].  The ALJ ultimately determined that Plaintiff

was not disabled because there are jobs that exist in significant numbers in the national economy that he can perform. [R. 33].

4.   On July 14, 2004, Plaintiff had an X-ray taken of his ribs at Our Lady of Lourdes Medical Center, which showed "no fracture or other bony abnormality" and "no pneumothorax or pleural effusion." The report states that the examination was normal. [R. 332].

5.   On November 14, 2006, Plaintiff's right foot was X-rayed at Cooper University Hospital. The radiologist noted "soft tissue swelling overlying the lateral malleolus without underlying fracture or malalignment." [R. 333].

6.   In or around March 2012, Plaintiff began attending weekly psychotherapy sessions as Nueva Vida Behavioral Health Center of New Jersey with Mr. Andres Ayala. [R. 304]. Months later, Plaintiff also began attending monthly sessions with the psychiatrist at Nueva Vida, Dr. Lyda Monte. [R. 317-18].

7.   On April 19, 2012, Plaintiff's therapist at Nueva Vida, Mr. Andres Ayala, completed a Biopsychosocial Assessment of Plaintiff which lists Plaintiff's chief complaints as depression, anxiety, perception disturbances, and poor sleep. Mr. Ayala noted that Plaintiff's symptoms were of moderate severity. [R. 391]. Plaintiff's estimated level of

intelligence was listed as low average.  [R. 395].  His Axis I diagnostic impression was schizoaffective disorder.  [R. 396].

8.   On April 23, 2012, Mr. Ayala noted that Plaintiff reported "feel[ing] very depressed, anxious" and having "visual and auditory hallucinations."  Mr. Ayala also noted that Plaintiff looked "unkempt, dirty clothes, unhealthy" and that Plaintiff's "affect is labile, his attitude is suspicious." [R. 354].

9.   On May 18, 2012, Mr. Ayala reported that Plaintiff had been diagnosed with schizoaffective disorder and assigned him a Global Assessment of Functioning ("GAF") score of 30-35.  Mr. Ayala also noted that Plaintiff had poor impulse control and reported problems with depression, anxiety, poor sleep, and perception disturbances, i.e. "visual, auditory, and tactile hallucinations."  [R. 345].

10.   On May 31, 2012, Mr. Ayala reported once again that Plaintiff had been diagnosed with schizoaffective disorder and noted that Plaintiff has been "presenting acute psychotic symptoms."  [R. 305].  Mr. Ayala also observed in Plaintiff's progress notes that Plaintiff "looks calm, stable, relax[ed], adequate degree of self-disclosure" during their counseling session.  [R. 358].

11.   On June 20, 2012, Mr. Ayala noted that during his therapy session with Plaintiff, Plaintiff "looks very impatient,

unable to sit still" and that Plaintiff's "speech is rapid, loud, unclear, poor interaction, hostile." [R. 359].

12.  On July 6, 2012, Plaintiff reported to Mr. Ayala that he went to Woodbury Hospital for crisis management for his suicidal ideations.  Mr. Ayala noted that Plaintiff "looks unhealthy, ungroomed, dressed with dirty clothes" and that "his affect is labile, poor concentration." [R. 360].

13.  On July 24, 2012, Mr. Ayala reported that Plaintiff had been diagnosed with schizoaffective disorder and personality disorder.  Mr. Ayala also opined that "[d]ue to [Plaintiff's] emotional condition, we consider that Mr. Flores is disable[d] at 100%." [R. 304].

14.  On August 28, 2012, Mr. Ayala's treatment notes from his counseling sessions with Plaintiff noted that Plaintiff showed "a moderate remission of his levels of depression and anxiety level" within the last six months and reduced psychotic symptoms.  Mr. Ayala assigned Plaintiff a GAF score of 35. [R. 346].  Plaintiff reported feeling hopeless and irritable and hearing voices. [R. 363].

15.  On September 12, 2012, Mr. Ayala noted that Plaintiff reported auditory hallucinations.  Mr. Ayala also noted that Plaintiff was in an unpleasant mood, had a "very labile" affect, and that he appeared anxious. [R. 364].

16.   On October 16, 2012, Plaintiff underwent a mental status examination with consulting psychologist Dr. David Bogacki.  Plaintiff reported to Dr. Bogacki that "he had no psychiatric history until his wife left him about 7 months ago . . . , which caused him to attempt suicide."  Dr. Bogacki noted that Plaintiff attended weekly counseling sessions at Nueva Vida, but that he had not yet seen the psychiatrist there.  Dr. Bogacki noted that Plaintiff alleged auditory hallucinations to kill himself.  He also noted that Plaintiff "exerted poor effort during the cognitive aspect of the exam."  [R. 306-07].

17.   Dr. Bogacki's Axis I diagnostic impression was "adjustment disorder with depressed mood, rule out major depressive disorder, recurrent with psychotic features."  He assigned Plaintiff a GAF score of 65.  In Dr. Bogacki's opinion, Plaintiff had the "residual capacity to follow work-related instructions, maintain pace and persistence on tasks and relate to the general public."  [R. 306-07].

18.   On October 24, 2012, Plaintiff informed Mr. Ayala that he was waiting for his psychiatric evaluation and that he wanted medications as soon as possible.  Mr. Ayala noted that Plaintiff "was thoughtful, distracted, answering in monosyllables" and that "his affect is very labile."  [R. 368].

19.   On November 27, 2012, Mr. Ayala reported that Plaintiff "showed a mild remission" of his depression and

anxiety and that Plaintiff "reduced the frequency and intensity of his psychotic symptoms." [R. 347]. Mr. Ayala also noted that Plaintiff reported feeling "very depressed, very anxious, irritable, [and] hopeless." [R. 371].

20.  On November 28, 2012, Plaintiff was treated at the Cooper University Hospital emergency department, where he presented with a bruise and elevated blood pressure.  The emergency department records note a past medical history of paranoid schizophrenia and a language barrier [R. 308-10].

21.  On December 4, 2012, Plaintiff reported to Mr. Ayala that he was "practicing relaxation techniques" and felt "less depressed, less anxious." [R. 372].

22.  On December 6, 2012, consulting doctor Ken Klausman performed an internal medicine evaluation on Plaintiff.  Dr. Klausman noted that Plaintiff's review of systems was significant for "chest pain/chest tightness, shortness of breath, palpitations, frequent urination, abdominal discomfort, nausea, vomiting, constipation, difficulty urinating, low back problem, anemia, anxiety and depression." [R. 312]. Dr. Klausman's physical examination revealed that Plaintiff walked with a normal gait and was able to get on and off the examining table and go from lying down to sitting up without difficulty.  Plaintiff's hand grips were 5/5 bilaterally and his fine hand motor movements were within normal limits bilaterally.

Plaintiff could pick up a coin and make a fist, but had a resting tremor of the hands. Dr. Klausman noted that "[s]traight leg raising at 80 degrees produced non-radiating SI joint pain bilaterally" and that Plaintiff "had mild difficulty heel, toe and tandem walking" and "mild difficulty squatting." [R. 314].

23.  Dr. Klausman's neurological exam revealed that Plaintiff was oriented to place and person, but not time. Plaintiff was unable to spell the word "world" backwards in Spanish, did not know who the president of the United States was, and could not count backwards from one hundred by threes. Dr. Klausman also reported that Plaintiff's affect was flat and that he did "not have a belt or shoe laces and [that] his clothes are soiled." Plaintiff told Dr. Klausman that he did not wear a belt or shoe laces "because he may use them to hang himself." Dr. Klausman's impressions were "depression with possible history of suicide intention" and "low back pain." Dr. Klausman prescribed an X-ray of Plaintiff's lumbar spine. [R. 314].

24.  On December 17, 2012, Plaintiff underwent a lumbar spine X-ray, which revealed "scoliosis with convexity to the right," "disc space narrowing" at L4-L5 and L5-S1, and "developmental canal stenosis." The X-ray showed "no fracture or subluxation." [R. 316].

8

25.   On December 18, 2012, Mr. Ayala, Plaintiff's therapist, noted that Plaintiff was anxious and moving constantly during their session.   Plaintiff reported that he was worried about his social security appointment.  [R. 375].

26.   On December 26, 2012, Dr. Joan Joynson, a State agency medical consultant, completed a Mental Residual Functional Capacity Assessment, in which she found that Plaintiff did not have understanding and memory limitations, or any significant limitations in his ability to carry out very short and simple instructions.   She found that Plaintiff was moderately limited in his ability to carry out detailed instructions and maintain attention and concentration for extended periods.   She also found that Plaintiff "is able to adequately respond to workplace changes for simple work."  [R. 59-60].

27.   On January 7, 2013, Mr. Ayala noted that Plaintiff was "talkative, stable, talking about his family" during their therapy session.  [R. 376].

28.   On January 13, 2013, Dr. Leonard Corness, a State agency medical consultant, completed a Physical Residual Functional Capacity Assessment, in which he found that Plaintiff could occasionally lift and carry fifty pounds and frequently lift and carry twenty-five pounds.   He also found that Plaintiff could stand, walk, and sit, with normal breaks, for six hours each in a normal eight-hour workday.   Dr. Corness noted

Plaintiff's lack of medical treatment or emergency room visits for back pain. [R. 57-58].

29.  On February 1, 2013, Plaintiff reported to his therapist, Mr. Ayala, that he was happy because he was able to see his daughters.  Mr. Ayala noted that Plaintiff was in a pleasant mood and that his affect was appropriate.  [R. 378]. The next week, Plaintiff once again reported feeling "less depressed, less anxious." [R. 379].

30.  On February 13, 2013, Plaintiff reported having auditory and tactile hallucinations to Mr. Ayala.  [R. 380].

31.  On February 28, 2013, Mr. Ayala, noted that, during the prior six months, Plaintiff "showed poor remission" of his symptoms and that Plaintiff "reduced his psychotic symptoms." [R. 348].

32.  In March 2013, Plaintiff was prescribed Seroquel, Prozac, and Vistaril by Dr. Lyda Monte, the psychiatrist at Nueva Vida.  [R. 317].  Dr. Monte's treatment notes state "+ voices / depressed / SI / sees shadows."  In April 2013, the treatment notes once again indicated "+ voices" but "- SI". [R. 318].

33.  On August 13, 2013, Plaintiff was seen by Dr. Adam Hennessey at the emergency department of Our Lady of Lourdes Medical Center for migraine and chest wall pain.  [R. 337].  Dr. Hennessey noted "+ dysmetria, + romberg, no nystagmus, strength

5/5 UE and L/E b/l, ataxic gait, no tremor no drift." He also noted that "ultram improved almost all of [Plaintiff's] symptoms, improved vision, resolved neck pain and headache." [R. 344].

34.   That same day, Dr. Glenn Articolo at Our Lady of Lourdes Medical Center performed frontal and lateral radiographs of Plaintiff's chest, which showed "no consolidation, edema, or pleural effusion." [R. 334]. Plaintiff also underwent a multiple axial CT scan of his head. Dr. Aaron Burns noted "no intracranial hemorrhage or mass effect." [R. 335].

35.   On September 18, 2013, Plaintiff's therapist, Mr. Ayala, once again reported that Plaintiff "showed a mild remission of his depression and anxiety." He assigned Plaintiff a GAF score of 35-40. [R. 349].

36.   On February 12, 2014, Mr. Ayala noted that Plaintiff was taking his psychiatric medication as prescribed by his psychiatrist and that Plaintiff "looks cooperative and participative, his affect is appropriate, good interaction." Mr. Ayala found Plaintiff's medication to be effective. [R. 382].

37.   On March 17, 2014, Mr. Ayala noted that Plaintiff reported feeling happy because he saw his daughters. He also noted that Plaintiff was "friendly, happier" and that his "affect is appropriate." [R. 383].

38.  On March 27, 2014, Mr. Ayala noted a mild remission in Plaintiff's signs and symptoms of depression and anxiety and an improvement in Plaintiff's social functioning.  [R. 350].  Mr. Ayala reported that Plaintiff "feels stable" because he has been spending time with family.  [R. 384].

39.  On April 28, 2014, Plaintiff reported to Mr. Ayala that he felt irritable and angry and that he had nightmares. Mr. Ayala noted that Plaintiff was "hostile" and that "his speech is loud, rapid, unclear."  [R. 386].

40.  On May 6, 2014, Plaintiff was examined by consulting doctor Alexander Hoffman.  Dr. Hoffman noted Plaintiff's history of depression, schizophrenia, and suicidal tendencies, as well as Plaintiff's complaints of back pain.  He noted that Plaintiff has never had a full evaluation for his back pain, but that Plaintiff complained of "persistent discomfort in his lower back with occasional radiation into his lower extremities." Plaintiff did not walk with a cane, but walked with "an antalgic gait."  Dr. Hoffman reported that "straight leg raising is pretty limited to about 45 on the right and 50 on the left, at which time [Plaintiff] has back pain."  He also noted that Plaintiff "has good grip strength, biceps and triceps strength" and "full range of motion at the wrist, elbow, and shoulder," but that he is "leery of bending."  [R. 319-20].

41.   Dr. Hoffman completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) Form.  He found that Plaintiff could occasionally lift and carry up to 10 pounds.  He also opined that Plaintiff could sit for one hour and stand and walk for fifteen minutes without interruption.  In Dr. Hoffman's opinion, Plaintiff can sit for a total of three hours, stand for a total of one hour, and walk for a total of one hour in an eight hour workday.  Finally, Dr. Hoffman noted that Plaintiff could only occasionally reach, hand, finger, feel, and push/pull, but that he could never operate foot controls, climb stairs, ramps, ladders, or scaffolds, balance, stoop, kneel, crouch, or crawl.  [R. 323-27].

42.   Dr. Bogacki conducted a mental status examination of Plaintiff again on May 9, 2014, with the assistance of a certified Spanish translator.  Plaintiff reported that he attends weekly counseling sessions and sees a psychiatrist monthly at Nueva Vida.  Dr. Bogacki noted that Plaintiff "revealed a very histrionic presentation of his symptoms," "was extremely exaggerated," and that "throughout the evaluation, he was clutching in his chest, squeezing his injured hand." Although Plaintiff's "mood was depressed and agitated," Dr. Bogacki noted "no overt psychotic symptoms."  Plaintiff's "abstraction, judgment, and insight were poor."  He could not recall three objects after five minutes, could not calculate

13

serial 7s or 3s, and could not spell "world" backwards in
Spanish.  Dr. Bogacki opined that if Plaintiff were granted
benefits, he would need a payee.  Dr. Bogacki's diagnostic
impression was "rule out exaggeration of symptoms, rule out
bipolar disorder, not otherwise specified."  He assigned
Plaintiff a GAF score of 60.  [R. 330-31].

43.  On May 15, 2014, Dr. Lyda Monte, Plaintiff's
psychiatrist at Nueva Vida, noted "- voices" and "sleep good."
[R. 352].

44.  On June 18, 2014, Plaintiff reported hearing voices
"calling his name" to Mr. Ayala.  Mr. Ayala observed that
Plaintiff was "anxious, moving constantly on his chair."
[R. 388].

45.  On July 7, 2014, during his therapy session with Mr.
Ayala, Plaintiff reported feeling "very impulsive, anxious,
irritable" and having lost "interest in pleasurable activities."
[R. 389].

46.  On July 17, 2014, Plaintiff's psychiatrist, Dr. Monte,
completed a Medical Source Statement of Ability to do Work-
Related Activities (Mental) Form.  Dr. Monte opined that
Plaintiff had marked limitations in understanding, remembering,
and carrying out simple instructions, and extreme limitations in
making judgments on simple and complex work-related decisions
and understanding, remembering, and carrying out complex

14

instructions.  She noted that he has "poor memory, poor concentration."  [R. 400].  Dr. Monte also reported that Plaintiff has marked limitations in interacting appropriately with the public, and extreme limitations in interacting appropriately with supervisors and coworkers, and responding appropriately to usual work situations and changes in routine work settings, due to his "high levels of anxiety, socialization problems" and "depression, anxiety, insomnia, [and] perception disturbances."  [R. 401].

47.  Plaintiff's niece, Margarita Saez, submitted a Third Party Function Report on September 26, 2012.  She explained that she assists Plaintiff with shopping and running errands.  She noted that Plaintiff "can't work due to psychiatric issues and the medications he's taking [for] severe back pain" and that Plaintiff's sleep is affected because he "hears voices" and has "nervousness."  Ms. Saez also explained that Plaintiff has "back problems and [is] very forgetful," and that he has difficulty "completing tasks[s]" because he is "easily distracted" and "doesn't follow any instructions."  [R. 258-65].

48.  On April 16, 2013, with the assistance of his attorney, Plaintiff completed an Adult Function Report.  He reported having trouble falling and staying asleep and difficulty dressing, bathing, shaving himself, and caring for his hair.  He also stated that he does light household chores

"very slowly" and has "to take many breaks."  He reported that
he cannot follow written instructions well and that he is
"limited to simple instructions."  He also reported that he does
not follow spoken instructions well: "I do not remember, I get
confused, I loos [sic] my concentration."  Plaintiff also noted
that he has "overwhelming fear when doing simple things.  [He]
get[s] very paranoid [and] [f]eel[s] like people are watching
[his] every move."  [R. 276-83].

49.  The following consists of the procedural history.  On
July 12, 2012, Plaintiff applied for Social Security Disability
benefits.  On July 16, 2012, Plaintiff also applied for
Supplemental Security Income benefits.  He originally alleged an
onset date of January 1, 2006.  On January 18, 2013, Plaintiff's
claims were denied initially and, on May 7, 2013, his claims
were denied on reconsideration.  Plaintiff requested a hearing
before an ALJ on May 24, 2013.  On July 16, 2014, a hearing
before the ALJ took place.  Plaintiff appeared with the
assistance of a Spanish language interpreter and with his
attorney, Adrienne Jarvis.  The ALJ heard only an opening
statement from Plaintiff's attorney; neither Plaintiff nor a
vocational expert testified at the hearing.  On August 7, 2014,
the ALJ issued an unfavorable decision on Plaintiff's claims.
On July 21, 2015, the Appeals Council denied Plaintiff's request
for review of ALJ's decision.

50.   The Commissioner has promulgated a five-step,
sequential analysis for evaluating a claimant's disability, as
outlined in 20 C.F.R. § 404.1520(a)(4)(i)-(v).  Here, the ALJ
determined that Plaintiff was not disabled at the fifth and
final stage of this analysis ("Step Five").  At Step Five, the
burden of production shifts to the Commissioner, who must
demonstrate that the claimant is capable of performing other
available work in order to deny a claim of disability.  20
C.F.R. § 404.1520(f); Plummer v. Apfel, 186 F.3d 422, 428 (3d
Cir. 1999).

51.   A reviewing court must uphold the Commissioner of
Social Security's factual findings if they are supported by
"substantial evidence," even if the court would have decided the
inquiry differently.  42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli
v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Knepp v. Apfel,
204 F.3d 78, 83 (3d Cir. 2000).  "Substantial evidence" means
"'more than a mere scintilla. It means such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971)
(quoting Cons. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938));
Plummer, 186 F.3d at 427.  Where the evidence is susceptible to
"more than one rational interpretation, the Commissioner's
conclusion must be upheld."  Ahearn v. Comm'r, 165 F. App'x 212,
215 (3d Cir. 2006) (citing Daring v. Heckler, 727 F.2d 64, 70

17

(3d Cir. 1984); Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986)).

52.   If faced with conflicting evidence, however, the Commissioner "must adequately explain in the record his reason for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  Stated differently, "unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977)) (internal quotations omitted); see also Guerrero v. Comm'r, 2006 WL 1722356, at *3 (D.N.J. June 19, 2006) ("The ALJ's responsibility is to analyze all the evidence and to provide adequate explanations when disregarding portions of it."), aff'd, 249 F. App'x 289 (3d Cir. 2007).

53.   While the Commissioner's decision need not discuss "every tidbit of evidence included in the record," Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004), it must consider all pertinent medical and non-medical evidence and "explain

18

[any] conciliations and rejections," <u>Burnett v. Comm'r of Soc.</u> <u>Sec.</u>, 220 F.3d 112, 122 (3d Cir. 2000); <u>see also</u> <u>Fargnoli</u>, 247 F.3d at 42 ("Although we do not expect the ALJ to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records, we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law.").

54.  In addition to the "substantial evidence" inquiry, the reviewing court must also determine whether the ALJ applied the correct legal standards.  <u>See</u> <u>Sykes v. Apfel</u>, 228 F.3d 259, 262 (3d Cir. 2000); <u>Friedberg v. Schweiker</u>, 721 F.2d 445, 447 (3d Cir. 1983).  The Court's review of legal issues is plenary. <u>Sykes</u>, 228 F.3d at 262 (citing <u>Schaudeck v. Comm'r</u>, 181 F.3d 429, 431 (3d Cir. 1999)).

55.  The Court will address each of Plaintiff's arguments on appeal in turn.

56.  Plaintiff first argues that the ALJ erred in rejecting Dr. Hoffman's May 2014 opinions, for several reasons, and that, due to this error, substantial evidence does not support the ALJ's RFC assessment for a full range of light work, the ALJ's credibility determination, or the ALJ's determination of non-disability at Step Five.

57.   Specifically, Plaintiff contends that the ALJ did not properly address each of Dr. Hoffman's opinions about Plaintiff's exertional limitations and, therefore, improperly rejected them in determining that Plaintiff could perform a full range of light work.   Plaintiff also argues that the ALJ did not address Dr. Hoffman's clinical findings, such as Plaintiff's antalgic gait, positive straight leg raising tests, and inability to walk toe to heel.   Additionally, Plaintiff complains that the ALJ did not expressly evaluate Dr. Hoffman's opinions about how long Plaintiff could stand, sit, and walk without breaks, reach, and manipulate.

58.   Plaintiff also maintains that the ALJ erroneously rejected Dr. Hoffman's May 2014 opinions as inconsistent with Dr. Klausman's December 2012 findings for two reasons.   First, Dr. Klausman did not opine on Plaintiff's functional limitations and, therefore, did not offer opinions that were inconsistent with Dr. Hoffman's opinions.   Second, in Plaintiff's view, "[t]he ALJ assumed without foundation that Flores's degenerative disc disease of the lumbosacral spine was a static condition, i.e., that Flores's degenerative disc disease did not worsen

from December 2012 to May 2014."   Plaintiff's Opening Brief

("Pl. Br.") at 14 [Docket No. 9] (emphasis in original).[1]

59.   Likewise, Plaintiff contends that the ALJ erroneously
rejected Dr. Hoffman's opinions as inconsistent with Dr.
Hennessey's August 2013 treatment notes, given that Dr.
Hennessey also found that Plaintiff suffered from an irregular
gait and had positive Romberg's sign.

60.   The ALJ found that, "[a]lthough the clamant informed
Ken Klausman, M.D., during a consultative exam on December 6,
2012, that he was experiencing low back pain, Dr. Klausman
reported that the claimant walked with a normal gait without the
use of a handheld assistive device, was able to get on and off
the exam table without difficulty, and could transfer from lying
down to sitting up without difficulty (Exhibit 4F).   Dr.
Klausman stated that the claimant had 5/5 strength in his lower
extremities, had only mild difficulty with heel, toe, and tandem
walking, and mild difficulty with squatting.   X-rays of the
claimant's lumbar spine taken on December 17, 2012, showed disc
space narrowing at L4-L5 and L5-S1 with developmental canal
stenosis, but no fracture or subluxation.   Adam Hennessey, D.O.,

---

[1] Plaintiff concedes that "[b]ecause this argument pertains
to evidence of worsening after Flores's December 31, 2011 date
last insured, the argument in not relevant to the ALJ's denial
of Flores's [disability insurance benefits] claim," and only
applies to the ALJ's denial of Plaintiff's supplemental security
income claim.

stated on August 13, 2013, that the claimant had no back
tenderness, had 5/5 strength in his lower extremities, equal
muscle mass and motion in his extremities, and intact motor and
sensory functioning (Exhibit 11F).  Although the claimant
informed Alexander Hoffman, M.D., during a consultative exam on
May 6, 2014, that he continued to have lower back pain, he
admitted that he had never sought treatment for this condition
(Exhibit 6F).  Upon exam, Dr. Hoffman stated that the claimant
walked with an antalgic gait and had positive straight leg
raising at 45 degrees, but did not use a cane, was able to get
on the exam table without help, was able to put weight on one
leg at a time, had 5/5 strength, and had no sensory or reflex
loss.  The claimant's credibility regarding the severity of his
back pain is undermined by the lack of treatment in the record.
There is no evidence that the claimant has taken any pain
medications, received epidural steroid injections, participated
in physical therapy, or received chiropractic treatment.  There
is also no evidence of nerve root impingement or that the
claimant requires an assistive device to ambulate."  [R. 29].

61.  In assessing the weight to give Dr. Hoffman's
opinions, the ALJ further found that "Dr. Hoffman opined during
a consultative exam on May 6, 2014, that the claimant could lift
and carry 10 pounds occasionally, sit for 3 hours, stand for 1
hour, and walk for 1 hour in an 8-hour workday (Exhibit 6F).

22

Dr. Hoffman opined further that the claimant could never climb, balance, stoop, kneel, crouch, or crawl, and must avoid exposure to unprotected heights, moving mechanical parts, and extreme cold.  Little weight is assigned to Dr. Hoffman's opinion, as it is inconsistent with the objective medical evidence and the record as a whole.  In particular, Dr. Hoffman's opinion is inconsistent with Dr. Klausman's evaluation notes, which indicate that the claimant walked with a normal gait without the use of a handheld assistive device, was able to get on and off the exam table without difficulty, could transfer from lying down to sitting up without difficulty, had 5/5 strength in his lower extremities, had only mild difficulty with heel, toe, and tandem walking, and mild difficulty with squatting (Exhibit 4F). Dr. Hoffman's opinion is inconsistent with Dr. Hennessey's treatment notes, which stated that the claimant had no back tenderness, 5/5 strength in his lower extremities, equal muscle mass and motion in his extremities, and intact motor and sensory functioning (Exhibit 11F)."  [R. 31].

62.  "There is no requirement that the ALJ discuss in [his] opinion every tidbit of evidence included in the record."  Hur, 94 F. App'x at 133.  Nonetheless, the ALJ must review and consider all pertinent medical and non-medical evidence and "explain [any] conciliations and rejections."  Burnett, 220 F.3d at 122; see also Fargnoli, 247 F.3d at 42 ("Although we do not

23

expect the ALJ to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records, we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."). Moreover, "[w]here the evidence conflicts, the ALJ may choose whom to credit, but [he] cannot reject evidence for no reason or for the wrong reason.  To the contrary, [he] must consider all the evidence and give some reason for discounting that which she rejects." Masher v. Astrue, 354 F. App'x 623, 627 (3d Cir. 2009) (internal citations, quotations, alterations omitted).

63.  The ALJ considered many of Dr. Hoffman's opinions regarding Plaintiff's limitations and assigned little weight to them in light of the medical record as a whole.  Specifically, the ALJ noted that other medical evidence from Dr. Klausman and Dr. Hennessey suggested that Plaintiff was not as limited as Dr. Hoffman had opined.

64.  Plaintiff argues that Dr. Klausman did not opine on Plaintiff's functional limitations and, therefore, did not offer opinions that were inconsistent with Dr. Hoffman's.  This Court is not persuaded by this argument.  Although Dr. Klausman did not give specific opinions on how many hours Plaintiff could sit or stand, for example, he did observe that Plaintiff walked with a normal gait without assistance, could move around during the

examination without difficulty, and had 5/5 strength in his lower extremities.  The ALJ found that Dr. Klausman's findings regarding Plaintiff's mobility and strength were inconsistent with the extreme functional limitations put forth by Dr. Hoffman.  The Court sees no error in the ALJ's determination.

65.  The ALJ also noted that Dr. Hoffman's opinions were inconsistent with Dr. Hennessey's treatment notes, which reported no back tenderness, 5/5 strength in Plaintiff's lower extremities, equal muscle mass and motion in Plaintiff's extremities, and intact motor and sensory functioning.  These findings, in the ALJ's view, were inconsistent with the numerous limitations provided by Dr. Hoffman.  The Court, once again, finds no error in the ALJ's determination.

66.  Additionally, the Court rejects Plaintiff's argument that the ALJ improperly rejected Dr. Hoffman's May 2014 opinions in favor of the older opinions of Dr. Klausman and Dr. Hennessey, even though Plaintiff suffers from degenerative disc disease that may worsen over time.  "[T]he ALJ was not bound to accept all of Dr. [Hoffman's] conclusions merely because his report was the most recent."  Howze v. Barnhart, 53 F. App'x 218, 221 (3d Cir. 2002) (rejecting appellant's argument that it is improper for ALJ to use older evidence to contradict newer evidence in the case of degenerative illness where substantial evidence supported ALJ's determination).  In any case, the

Commissioner rightly notes that Plaintiff's position that his back disease worsened from 2012 to 2014 lacks foundation in the record.  Commissioner's Brief ("Comm. Br.") at 17 [Docket No. 10].  Dr. Hoffman even noted that, as of May 2014, Plaintiff had still never had a full evaluation for his back pain, did not walk with a cane, and did not need assistance getting on or off the examination table.  The ALJ acknowledged this, observing that Plaintiff reported to Dr. Hoffman that he had never sought treatment for his back problems.  The ALJ also noted that "there are absolutely no treatment notes in the record that indicate that [Plaintiff] has ever sought treatment for" back pain and that "it is the claimant's responsibility to provide medical evidence showing that he has an impairment, and to show how the impairment affects his functioning during the time alleged as disabled."  [R. 29].  The Court finds that the ALJ did not err in this respect.

67.  Plaintiff correctly identifies, however, that the ALJ did not address, one way or the other, Dr. Hoffman's opinions regarding Plaintiff's limited ability to sit, stand, and walk without frequent breaks, or Plaintiff's ability to only occasionally reach and manipulate.  The ALJ appears to have rejected these limitations, as they were not incorporated into Plaintiff's RFC, without explaining why.  The Court reiterates that "the ALJ may choose whom to credit, but [he] cannot reject

26

evidence for no reason or for the wrong reason" and "must consider all the evidence and give some reason for discounting that which [he] rejects." <u>Masher</u>, 354 F. App'x at 627. Remand is appropriate for the ALJ to consider these opinions of Dr. Hoffman only.

68. This Court's role on appeal is limited; the Commissioner's factual findings must be upheld if they are supported by "substantial evidence," even if the court would have decided the inquiry differently. 42 U.S.C. §§ 405(g), 1383(c)(3); <u>Fargnoli</u>, 247 F.3d at 38; <u>Knepp</u>, 204 F.3d at 83. Here, the Court finds that substantial evidence supports the ALJ's decision to assign little weight to the opinions of Dr. Hoffman that were specifically addressed in the ALJ's decision. <u>See</u> <u>Richardson</u>, 402 U.S. at 401 ("Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."). Accordingly, the ALJ's decision to assign little weight to these opinions is affirmed. However, the ALJ improperly rejected without explanation Dr. Hoffman's opinions that Plaintiff could only sit for one hour and stand and walk for fifteen minutes without interruption and that Plaintiff could only occasionally engage in reaching, handing, fingering, or feeling. The Court will remand for the ALJ to explicitly consider these opinions only.

27

69.  Next, Plaintiff argues that substantial evidence does not support the ALJ's determination at Step Five that the Plaintiff is not disabled because the ALJ failed to support the decision with vocational expert testimony or other similar evidence.  Specifically, Plaintiff takes issue with the ALJ's determination that a finding of "not disabled" is "directed" by Medical-Vocational Rule 202.17, given that Plaintiff has both exertional and non-exertional limitations.

70.  In his RFC assessment, the ALJ restricted Plaintiff to understanding, remembering, and carrying out simple instructions.  In Plaintiff's view, because the ALJ found that Plaintiff has both exertional and non-exertional limitations, the ALJ was required to use Rule 202.17 as a "framework", rather than to direct a finding of non-disability, unless he notified Plaintiff in advance of his intent to rely upon a social security regulation in addition to the Medical-Vocational Rules. Additionally, to carry his burden at Step Five, the Plaintiff maintains, the ALJ should have obtained vocational expert testimony or similar evidence.

71.  The Commissioner counters that the Medical-Vocational Rules already account for Plaintiff's non-exertional limitations that the ALJ noted in his RFC.  In other words, in the Commissioner's view, the ALJ's restriction of Plaintiff to jobs that involve only simple instructions is a non-exertional

28

limitation that is already contemplated in the unskilled jobs encompassed by the Medical-Vocational Rules. Accordingly, the Commissioner argues, the ALJ properly found that the Medical-Vocational Rules directed a finding of not disabled.

72. After noting that Plaintiff was 45 years old on the alleged disability onset date, that Plaintiff has a limited education and is able to communicate in English,[2] and that transferability of job skills is not an issue in this case because Plaintiff's past relevant work is also unskilled, and after considering Plaintiff's RFC, the ALJ determined that Plaintiff is not disabled because there are jobs that exist in

---

[2] Plaintiff also argues, parenthetically, that "[s]ubstantial evidence does not support the ALJ's finding that Flores could communicate in English given Flores's use of Spanish-language interpreter" at the hearing before the ALJ. Pl. Br. at 16. The Court agrees. Plaintiff appeared at the hearing with a Spanish-language interpreter. Additionally, the record reflects that Plaintiff was often examined with the assistance of an interpreter. See, e.g., [R. 51, 268, 310, 330]. Likewise, the results of his mental status examinations indicate that, for example, Plaintiff was asked to spell the word "mundo," or "world" in Spanish, backwards and was unable to do so. See, e.g., [R. 54, 314]. The Court notes that Rule 201.00(h)(1)(iv) states that "a finding of 'disabled' is warranted to individuals 45-49 who: . . . [a]re unable to communicate in English, or are able to speak and understand English but are unable to read or write in English." 20 C.F.R. Part 404, Subpart P, Appendix 2. Accordingly, the Court finds that remand on this issue is necessary. On remand, the ALJ should reevaluate his conclusion that Plaintiff is able to communicate in English for purposes of determining whether there are jobs in the national economy that Plaintiff can perform. The ALJ may, if appropriate, come to the same conclusion, but he must support it with substantial evidence.

significant numbers in the national economy that Plaintiff can perform.  [R. 33].

73.  Specifically, at Step Five, the ALJ found that "[i]n determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either 'disabled' or 'not disabled' depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decision-making unless there is a rule that directs a conclusion of 'disabled' without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making (SSR 85-15).  Based on a residual functional capacity for the full range of light work, considering claimant's age, education, and work experience, a

finding of 'not disabled' is directed by Medical-Vocational Rule 202.17." [R. 33].

74. Generally, the claimant has the burden of establishing disability at each step of the sequential process; however, the "Commissioner bears the burden of proof for the last step." Sykes, 228 F.3d at 263 (citing Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987)). At the fifth step, the ALJ must demonstrate that the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show that jobs exist in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and RFC. Id.

75. To carry the burden at Step Five, the ALJ may utilize the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2. As the Third Circuit has explained, "[t]he grids [in the Medical-Vocational Guidelines] consist of a matrix of four factors--physical ability, age, education, and work experience--and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." Sykes, 228 F.3d at 263. "Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion that work exists that the claimant can perform." Id.

31

76.   However, the Third Circuit has held that where a claimant has both exertional and non-exertional impairments, the ALJ cannot rely upon the grids in the Medical-Vocational Guidelines alone to determine non-disability.  Id. at 273.  The ALJ must also obtain "the testimony of a vocational expert or other similar evidence, such as a learned treatise," in order to carry his burden at Step Five.  Id.  Alternatively, the ALJ must provide the claimant with notice that he intends to take official notice of the fact that the claimant's non-exertional impairments do not erode the occupational base, and the claimant must have an opportunity to oppose that conclusion.  Id.

77.   In Allen v. Barnhart, the Third Circuit clarified that if the ALJ "wishes to rely on an SSR [social security ruling] as a replacement for a vocational expert, it must be crystal-clear that the SSR is probative as to the way in which the nonexertional limitations impact the ability to work, and thus, the occupational base."  417 F.3d 396, 407 (3d Cir. 2005).  The Third Circuit further explained that "the claimant should have the opportunity to consider whether it wishes to attempt to undercut the Commissioner's proffer [of an SSR] by calling claimant's own expert.  Obviously, this requires notice in advance of the hearing."  Id. at 407-08.  Where advance notice is not given, "close scrutiny to the ALJ's reliance on a Ruling

as satisfying the Commissioner's burden at Step 5" is required.
Id. at 408.

78.  Here, the ALJ's RFC assessment limited Plaintiff to
the full range of light unskilled work.  The ALJ further limited
Plaintiff to "understanding, remembering, and carrying out
simple instructions, making judgments that are commensurate with
the functions of unskilled work (i.e., simple work-related
decisions), responding appropriately to supervision, co-workers,
the general public and usual work situations, and dealing with
changes in a routine work setting." [R. 26].  Plaintiff
contends that his restriction to understanding, remembering, and
carrying out only simple instructions is a non-exertional
limitation that may erode the base of light unskilled work.  In
Plaintiff's view, this required the ALJ to obtain vocational
expert testimony or other similar evidence or to give him notice
in advance of his intention to rely upon an SSR that states that
such a non-exertional limitation does not erode the occupational
base.  The Court agrees.

79.  Apparently relying on SSR 85-15, the Commissioner
argues that the grids take administrative notice of unskilled
jobs in the economy and that Plaintiff's non-exertional
limitation to handling only simple instructions is encompassed
in the limitation to unskilled work.  SSR 85-15 states that
"[t]he basic mental demands of competitive, remunerative,

33

unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base."

80.   It is not for this Court to decide whether Plaintiff's non-exertional limitation is or is not co-extensive with unskilled work, see Pl. Br. at 19.  Rather, this determination should be made by the ALJ, either with the assistance of vocational expert testimony or similar evidence or by proffering an SSR in advance to the Plaintiff.  The ALJ did not rely upon SSR 85-15 in his decision to determine that Plaintiff's non-exertional limitation did not erode the base of unskilled light work in the national economy.  This falls far short of the Third Circuit's requirement that the ALJ make "crystal-clear that the SSR is probative as to the way in which the nonexertional limitations impact the ability to work, and thus, the occupational base."  See Allen, 417 F.3d at 407.  The ALJ should have obtained vocational expert testimony or other similar evidence, or given the Plaintiff notice in advance of the hearing that he intended to rely upon SSR 85-15.  See, e.g., Meyler v. Comm'r of Soc. Sec., 238 F. App'x 884, 890 (3d Cir.

2007) (remanding, after closely scrutinizing ALJ's reliance on SSR at Step Five, for further elaboration at Step Five where "the ALJ relied upon SSR 85-15 and SSR 83-10 without calling a vocational expert, and without providing advance notice to [plaintiff] so she could call her own vocational expert"); Sykes, 228 F.3d at 273; Allen, 417 F.3d at 407-08; Kuznetsov v. Astrue, 2012 WL 11028, at *8 (W.D. Pa. Jan. 3, 2012) (remanding for reconsideration of Step Five determination and finding that "ALJ's generalized citation to SSR 85-15 will not suffice").

81. Accordingly, the Court finds that the ALJ's determination that Medical-Vocational Rule 202.17 directs a finding of "not disabled" is not supported by substantial evidence. Remand is appropriate for the ALJ to properly evaluate whether jobs exist in the national economy that Plaintiff would be capable of performing, given his exertional and non-exertional limitations. "This can be accomplished by noting how SSR 85-15 is relevant and controlling--if indeed that is the case--or by obtaining the individualized assessment that SSR 85-15 seems to prefer by way of a vocational expert." Allen, 417 F.3d at 407. If the ALJ intends to rely upon an SSR once again, advance notice should be given to the Plaintiff. See id. at 407-08 ("urg[ing] that, as a matter of fairness, alerting a claimant to the relevant rule in advance will always be appropriate.").

35

82.  Next, the Plaintiff argues that substantial evidence
does not support the ALJ's RFC assessment, credibility finding,
or ultimate finding of non-disability because the ALJ erred in
relying on non-existent testimony from the Plaintiff to find him
not credible.  Plaintiff identifies two portions of the ALJ's
decision in which the ALJ appears to refer to Mr. Flores's
testimony at the hearing.  Mr. Flores, however, did not testify
at the hearing before the ALJ; only his attorney provided an
opening statement.  [R. 39-43].  The ALJ specifically stated at
the hearing that he had no questions for Mr. Flores.  [R. 43].

83.  The Commissioner, in turn, contends that "Plaintiff
overlooks the fact that his counsel, on his behalf, made
extensive statements about his inability to function."  Comm.
Br. at 13.  In the Commissioner's view, "[r]egardless, who made
the statements [sic], the fact of the matter is that the ALJ
appropriately weighed the credibility of these subjective
complaints."  Id.

84.  The ALJ noted that "[t]he claimant appeared and
testified at a hearing held on July 16, 2014, in Pennsauken, NJ.
She [sic] testified with the assistance of a Spanish language
interpreter."  [R. 21] (emphasis added).  The ALJ further noted
that "[t]he record reflects that the claimant has performed a
generally normal range of functional abilities, which is
inconsistent with a finding of disability.  Although the

36

claimant testified at his hearing that his impairments severely
restricted his functional ability, the claimant indicated on an
Adult Function Report that he can prepare simple meals, do light
household chores, and shop in stores for food and personal items
(Exhibit 8E)." [R. 29] (emphasis added).

85. "Considering the numerous inconsistencies between the
claimant's testimony, the evidence of record, and the medical
findings of the treating physicians," the ALJ found that "the
claimant's subjective complaints and alleged limitations are not
fully persuasive and that the claimant retains the ability,
despite his limitations, to perform work activities with the
limitations set forth above." [R. 32] (emphasis added).

86. An ALJ's credibility determination is accorded great
deference and will not be disturbed unless it is "inherently
incredible or patently unreasonable." See Blue Ridge Erectors
v. Occupational Safety & Health Review Comm'n, 261 F. App'x 408,
410 (3d Cir. 2008); St. George Warehouse, Inc. v. NLRB, 420 F.3d
294, 298 (3d Cir. 2005).

87. To the extent that the ALJ's credibility determination
as to Mr. Flores was based on perceived inconsistencies between
Plaintiff's testimony at the hearing, which does not exist, and
his statements in the Adult Function Report and the medical
record, the Court finds that the credibility determination is
unreasonable. Plaintiff did not testify at the hearing and, so,

37

could not have given testimony at the hearing that was inconsistent with his prior statements or the medical record. The Court agrees with Plaintiff that "[n]o evidence is not substantial evidence." See Pl. Br. at 23.

88.   Furthermore, the Court rejects the Commissioner's contention that the ALJ was actually referring to Plaintiff's attorney's opening statement.  It is merely a post hoc justification for the ALJ's statements.  See Fargnoli, 247 F.3d at 44 n. 7 (noting that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.") (quoting SEC v. Chenery Corp., 318 U.S. 80, 87 (1943)).  Moreover, attorney statements or arguments are not testimony.  If the ALJ truly was referring to inconsistencies between the statements of Plaintiff's attorney, not the Plaintiff, and the medical record, then that must be made clear.  The ALJ will have an opportunity to clarify his position and to reevaluate his credibility determination as to the severity of Plaintiff's symptoms on remand.

89.   Finally, Plaintiff argues that the ALJ's RFC assessment, credibility finding, and the ultimate determination of non-disability are unsupported by substantial evidence because "the ALJ erroneously ruled that Flores's activities of

daily living were 'inconsistent with a finding of disability.'" Pl. Br. at 23 (citing [R. 29]).

90.  The ALJ found that "[t]he record reflects that the claimant has performed a generally normal range of functional abilities, which is inconsistent with a finding of disability. Although the claimant testified at his hearing that his impairments severely restricted his functional ability, the claimant indicated on an Adult Function Report that he can prepare simple meals, do light household chores, and shop in stores for food and personal items (Exhibit 8E).  The claimant informed Dr. Bogacki on October 16, 2012, th[at] he required no assistance on self-care tasks, maintains his own room, can use public transportation, and has a driver's license (Exhibit 2F). The claimant reported to Dr. Bogacki on May 9, 2014, that he assists with household chores (Exhibit 7F)."  [R. 29].

91.  "Although certainly disability does not mean that a clamant must vegetate in a dark room excluded from all forms of human and social activity, it is nonetheless appropriate for the ALJ to consider the number and type of activities in which the clamant engages."  Turby v. Barnhart, 54 F. App'x 118, 122 (3d Cir. 2002) (internal citations, quotations, modifications omitted) (quoting Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981); Burns v. Barnhart, 312 F.3d 113, 130-31 (3d Cir. 2002)); see also Hoyman v. Colvin, 606 F. App'x 678, 681 (3d Cir. 2015)

("The evidence from [plaintiff's] doctors and the evidence regarding his daily activities . . . support the ALJ's finding with respect to [plaintiff's] credibility.").

92.   In fact, the applicable federal regulations specifically state that consideration of the claimant's activities of daily living is appropriate in making credibility determinations regarding the severity and intensity of the claimant's symptoms.   See 20 C.F.R. § 404.1529 (disability insurance benefits); 20 C.F.R. § 416.929 (supplemental security income).

93.   20 C.F.R. § 404.1529(a) provides, in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c).  By other evidence, we mean the kinds of evidence described in §§ 404.1512(b)(2) through (8) and 404.1513(b)(1), (4), and (5), and (d). These include statements or reports from you, your treating or nontreating source, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work.  We will consider all of your statements about your symptoms, such as pain, and any description you, your treating source or nontreating source, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.  (emphasis added).

94.   Likewise, 20 C.F.R. § 404.1529(c)(3) states that "[f]actors relevant to your symptoms, such as pain, which we will consider include: (i) Your daily activities . . . ."

95.   The ALJ considered Plaintiff's reports regarding his ability to engage in activities of daily living to Dr. Bogacki and in his Adult Function Report in determining that Plaintiff's complaints of disabling pain and other symptoms were not entirely credible.  The ALJ also considered Plaintiff's activities of daily living to assess the severity of Plaintiff's symptoms and pain.  The Court finds that the ALJ permissibly and properly considered Plaintiff's activities of daily living for these purposes.

96.   Accordingly, the ALJ's credibility determination and assessment of the severity of Plaintiff's symptoms and pain are affirmed insofar as these determinations are based on the ALJ's review of Plaintiff's reports of his activities of daily living. However, as stated above, insofar as the ALJ's credibility determination turned on perceived inconsistencies between Plaintiff's non-existent testimony and his reports regarding his activities of daily living to doctors and in the Adult Function Report, the determination is not supported by substantial evidence and remand is, therefore, necessary.

ACCORDINGLY, FOR THE REASONS SET FORTH ABOVE, IT IS HEREBY, on this **6th** day of **September 2016**,

**ORDERED** that the decision of the Administrative Law Judge is **VACATED**, and the matter is **REMANDED** for further proceedings consistent with this Memorandum Order; and it is further

**ORDERED** that the Clerk of the Court shall **CLOSE** this file.

s/Renée Marie Bumb
RENÉE MARIE BUMB
United States District Judge